566 A.2d 310

**Marion D. KELLY t/d/b/a Kelly Building Company, Appellant,**

v.

**Charles J. HANNAN and Nancy L. Hannan, His Wife Legal Title Holders/Owners Alan E. Thompson and Terri L. Thompson, his Wife Equitable Title Owners, Appellees.**

Superior Court of Pennsylvania.

Argued May 18, 1989.

Filed Nov. 16, 1989.

Mary E. Baloh, Greensburg, for appellant.

J.R. Rygiel, Uniontown, for appellees.

Before BROSKY, POPOVICH and MONTGOMERY, JJ.

POPOVICH, Judge:

This is an appeal from the order entered in the Court of Common Pleas of Fayette County granting the appellees' preliminary objections. On appeal, the appellant, Marion D. Kelly (Kelly Building Company) hereafter "Kelly", con-

tends: (1) improved property remains subject to a mechanics' lien if the lease which purports to exempt the improved realty is patently fraudulent; and (2) the theory of estoppel validates a mechanics' lien filing where the parties to the construction contract are represented to be the owners of the improved realty. We reverse.

Briefly, the facts, as stated in the record, are as follows:

During the month of January, 1986, Mr. and Mrs. Charles J. Hannan claim they leased a portion of their property to their daughter and son in law, Terri and Alan Thompson. Mr. Hannan wrote the first lease by hand and dated it January 1, 1986. His signature was the only signature appearing therein. A formal lease was prepared thereafter by counsel and dated January 1, 1986, with the signatures of the Hannans and Thompsons. Mr. Hannan testified that the purpose of the leasing arrangement was to "give [the Thompsons] the property under a lease, in case something would ever happen to one of them, [he] wanted the property to revert back to [him]." (N.T. 11/1/88 p. 29)

On April 28, 1986, the Kelly Building Company entered into a construction contract with the Thompsons for the building of a home at the estimated cost of $229,877.75. (N.T. 3/1/88 p. 44) Initially, in 1986 when construction began, the Thompsons financed the construction with demand notes, and, thereafter, the Thompsons obtained a $100,000.00 mortgage. The bank issuing the mortgage knew that the Thompsons did not own the property. The record reveals that Mr. Hannan was an active member on the board of directors of the issuing bank, and he did not co-sign the loan.

The Thompsons zoning permit listed the home at a value of $100,000.00, and, during Mrs. Thompsons's deposition, she stated the figure was reduced so tax calculations in the future would be reduced. (N.T. 3/1/88 pp. 44–45) The home was insured for $225,00.00 under a home owner's policy. (N.T. 3/1/88 p. 72)

The appellant and his son testified that, during the bidding stage and at the time of signing the contract, Mr. and Mrs. Thompson stated that her father, Mr. Hannan, was "giving them a piece of property, approximately five to seven acres to build a house on." (N.T. 11/1/88 pp. 35, 37, 44) When applying for the zoning certificate and the permit for a sewage disposal system, the Thompsons listed themselves as the owners of the property. (N.T. 11/1/88 pp. 21, 24) Construction commenced under the contract on May 12, 1986. In August, 1986, the property was surveyed.

The Hannans and the Thompsons never recorded the lease, and the agreement was not disclosed to Mr. Kelly. The Hannans did not enter into the contract or agree in writing to pay for the improvements to the leased property. The Hannans claim that at the time the contract was entered into, and after construction began, Mr. Kelly knew that the Hannans were the owners of the land upon which the residence was being constructed. Terri Thompson stated that her father paid $50,000.00 toward the cost of the construction.

On December 8, 1987, Mr. Kelly filed a mechanics' lien against Charles and Nancy Hannan and Terri and Alan Tnompson.[1] Preliminary objections were filed by Charles and Nancy Hannan on January 19, 1988, asserting the existence of a written lease between themselves and the Thompsons. On November 4, 1988, an evidentiary hearing pursuant to 49 P.S. § 1505 [2] of the Mechanics' Lien Law of 1963 was conducted. These were the two issues addressed by the lower court at the hearing on the appellees' preliminary objections: (1) Was the improvement to leased premis-

---

**1.** The appellant's claim is for approximately $16,000 which is the final ten percent draw equalling $22,988.78 minus the credits the appellant deducted. (N.T. deposition 3/1/88 p. 28)

**2.** 49 P.S. § 1505 "Procedure of contesting claim; preliminary objections.

Any party may preliminarily object to a claim upon a showing of exemption or immunity of the property from lien, or for lack of conformity with this act. The Court shall determine all preliminary objections. If an issue of fact is raised in such objections, the Court may take evidence by deposition or otherwise."

es without the necessary written indication from the owners that the construction was for their immediate use and benefit; and (2) whether the theory of estoppel prohibited the owners from using the lease as a bar to the appellant's mechanics' lien. Preliminary objections were sustained, and this timely appeal followed.

The trial court sustained the appellees' preliminary objections based upon 49 P.S. § 1303(d) which provides in pertinent part:

§ 1303 LIEN NOT ALLOWED IN CERTAIN CASES
(d) Leasehold Premises. No lien shall be allowed against the estate of an owner in fee by reason of any consent given by such owner to a tenant to improve the leased premises unless it shall appear in writing signed by such owner that the erection, construction, alteration or repair was in fact for the immediate use and benefit of the owner.

49 P.S. § 1303(d)

Initially, we note our standard of review for the granting of preliminary objections as stated by this Court in *Chambers v. Todd Steel Pickling, Inc.*, 323 Pa.Super. 119, 470 A.2d 159, 161 (1983):

For purposes of our standard of review, an order sustaining preliminary objections to a mechanics' lien claim because of a showing of exemption or immunity of property from the Mechanics' Lien Law, is analogous to an order sustaining preliminary objections to a complaint in assumpsit.

[W]hen the sustaining of preliminary objects will result in a denial of claim, or a dismissal of suit, preliminary objections should be sustained only in cases which are clear and free from doubt. *Conrad v. City of Pittsburgh*, 421 Pa. 492, 218 A.2d 906 (1966); *Baker v. Brennan*, 419 Pa. 222, 213 A.2d 362 (1965); *Schrader v. Heath*, [408 Pa. 79, 182 A.2d 696], supra.

*Legman v. School District*, 432 Pa. 342, 345, 247 A.2d 566, 569 (1968).

*Chambers v. Todd Steel Pickling, Inc.,* at 124, 470 A.2d at 162.

Pursuant to a lengthy hearing and after considering the arguments presented therein, the lower court stated in its opinion:

[T]he construction contract for the dwelling home involved herein was entered into between [the] contractor and Alan Thompson and Terri Thompson. By its express terms, it manifests that the Thompsons were the persons agreeing to pay the contract price. There was never a contractual relationship between the contractor and [the Hannans], the owners, whereby they agreed to pay for said construction, or any portion thereof. No promise, by the owner, to pay is asserted. The fact that the owners had knowledge of and may have even consented to the construction is not in itself sufficient. *Murray v. Zemon,* 402 Pa. 354, 167 A.2d 253 (1961). "In order for the claim to be valid against the estate of the owner, where he is not party to the contract, his consent must appear in the form of a written statement, signed by him and which shall also state that the improvement is made for his immediate use and benefit. *Murray,* supra, 167 A.2d at 256. ... Where, as here, a contractor knows that the person with whom he is contracting is not the record owner, there is a duty upon the contractor to inquire into the nature of the consent given, if any, if he desires to subject the estate of the owner to a lien. *Murray,* supra, 167 A.2d at 257. (Trial Court Op. pp. 4, 5)

First, the appellant contends the lease between the Hannans and the Thompsons is fraudulent for the following reasons: (1) the lessees resided at a residence other than the address indicated on the lease agreement and the address given was that of the leased property which did not exist until six months after the signing of the lease; (2) the formal lease was drafted after January 1, 1986, by an attorney, and the appellees did not produce the original hand-written lease or the typed lease during the discovery process; (3) the leasing agreement was not recorded or

644

disclosed to the contractor; and (4) no check or receipt of payment could be produced to show that consideration had been paid pursuant to the lease agreement.

The validity of a lease is discussed by this Court in *Cusamano v. Anthony M. DiLucia, Inc.*, 281 Pa.Super. 8, 421 A.2d 1120, 1122 (1980):

We begin with the observation that leases are in the nature of contracts and are thus controlled by principles of contract law, including the well settled rules of interpretation and construction. *Pugh v. Holmes*, 253 Pa.Super. 76, 384 A.2d 1234 (1978), affirmed as modified, 486 Pa. 272, 405 A.2d 897 (1979). As in the case of other written contracts, the purpose in interpreting a lease is to ascertain the intention of the parties, and such intention is to be gleaned from the language of the lease. *National Biscuit Co. v. Baehr Bros.*, 203 Pa.Super. 133, 199 A.2d 494 (1964). Such intention is not to be determined merely by reference to a single word or phrase, but rather by giving every part of the document its fair and legitimate meaning. *Boyd v. Shell Oil Co.*, 454 Pa. 374, 377, 311 A.2d 616, 618–19 (1973); *Friestad v. Travelers Indemnity Co.*, 260 Pa.Super. 178, 393 A.2d 1212 (1978).

Where the terms of a lease are not ambiguous, the interpretation and construction are for the court, and the court must determine the intention of the parties from the language of the lease alone. *National Biscuit Co. v. Baehr Bros.*, supra. ...

[I]n order for us to find an ambiguity in a contract, we must find that the document is reasonable subject to two different interpretations. *Merriam v. Cedarbrook Realty, Inc.*, 266 Pa.Super. 252, 258–59, 404 A.2d 398, 401 (1978).

*Cusamano v. Anthony M. DiLucia, Inc.*, at 13–14, 421 A.2d at 1123.

Instantly, when reviewing the validity of the lease, the purpose of the entire agreement is to be given every fair and legitimate meaning. *Cusamano v. Anthony M. DiLucia, Inc.*, supra 281 Pa.Superior Ct. at 13, 421 A.2d at 1122.

The typed lease was drafted by an attorney, and the elements of the earlier hand-written agreement were incorporated and expanded upon to reflect the intent of the parties. The lease was not ambiguous in its meaning, and the typed lease was signed by the Hannans and the Thompsons. The document on its face reflects the intention of the parties held thereto.

We note, however, the controversy surrounding the leases. The hand-written lease signed by Mr. Hannan and the typed lease signed by the Hannans and the Thompsons were not produced during discovery or mentioned by the appellees' counsel and Terri Thompson during their depositions. Both leases were first introduced by the Hannans at the hearing. The appellant contends that the typed lease is patently fraudulent because the address given by the Thompsons as their current address on the lease agreement was that of the leased property which was not established until six months after the date of the lease.

During the cross examination of Terri Thompson, the confusion regarding the drafting of the lease was discussed by the appellees' counsel Mr. Rygiel. He stated that he prepared the lease but was unable to say when the lease was typed:

Q. And the first time—now, if I understand you correctly, you did not have an attorney draw up either one of these leases, [the handwritten or the typed], but rather it was done between you and your father?

A. I am sorry. I didn't understand that.

Q. You did not have an attorney draw those papers up?

A. I didn't, no.

MR. RYGIEL: Let's get that straight now. That was created in my office. I told you that. I typed that form up. The instructions are right there—Joe, in that first one. And we followed those instructions and we produced exactly what that original hand-written agreement is.

THE COURT: Her answer was that she did not have an attorney draw it up.

THE WITNESS: I did not. Correct.

MR. RYGIEL: She is correct, but I just wanted to clarify the situation.

MRS. BALOH: So your, just so I clarify it on the record, your Honor, because I wasn't told this and I did not know what lawyer drew up these papers, that Mr. Rygiel is putting on the record today, that he indeed drew up these papers.

MR. RYGIEL: From the information given, yes.

MRS. BALOH: And that, if I understand your to stipulate, you are saying as a fact that you drew it up and you drew it up in the early part of January of 1986.

MR. RYGIEL: I typed it up from the instructions, yes. No, no, no, I am not saying January 1, 1986, no, no, no. I don't know when. I don't know when I did it, but I just complied with the instructions and dated it as of January 1, 1986.

(N.T. 11/1/88 pp. 17, 18)

Cross examination of Terri Thompson continued, and she stated that on March 1, 1988, the day of her deposition, nearly two years after the date appearing on the lease, she had not yet realized that Mr. Rygiel had drawn up the lease. She said that Mr. Rygiel never stated to her during the deposition that he had completed the papers, and she did not know when the typed lease was prepared by Mr. Rygiel. She believed that Mr. Rygiel was given a copy [of the typed lease] after Mr. Kelly filed his Mechanics' Lien. (N.T. 11/1/88 p. 19) Clearly, the record supports the appellant's contention that the typed lease was not prepared on January 1, 1986.

In conclusion, we find that the language of the lease is not ambiguous and clearly reflects the intentions of the parties. The record also supports the appellant's allegations that there were misrepresentations regarding the lease and when it was actually prepared. With these discrepancies in mind, we now turn to the appellant's next contention wherein he claims the owners did not act in good faith throughout the transaction and the theory of estoppel validates the mechanics' lien.

The appellant contends the theory of estoppel validates a mechanics' lien where the parties to the construction contract are represented to be the owners of the improved realty. *Chambers v. Todd Steel Pickling, Inc.*, 323 Pa.Super. 119, 470 A.2d 159 (1983) citing *Fluke v. Lang*, 283 Pa. 54, 57, 128 A. 663, 664 (1925) (interpreting Section 2 of the Mechanics' Lien Act of 1901, replaced by 49 P.S. § 1303(d), in conjunction with Section 4 of the 1901 Act, which was omitted from the Mechanics' Lien Law of 1963).

The appellant's second contention is to be reviewed in light of the following language:

> '[A] mechanics' lien is a statutory proceeding, the action in rem being in the nature of collateral security for the payment of the debt due for work done or materials furnished' in accordance with a contract, express or implied. *Hoffman Lumber Co. v. Mitchell*, 170 Pa.Super. 326, 331, 85 A.2d 664, 667 (1952), allocatur denied; *Murray v. Zemon*, 402 Pa. 354, 167 A.2d 253 (1961); *Fisher Sprinkler Co. v. Ide*, 305 Pa.Super. 554, 451, A.2d 1015 (1982); Sections 201, 301 & 503 of the Mechanics' Lien law of 1963, Act of August 24, 1963, P.L. 1175, 49 P.S. §§ 1201, 1301 & 1503.

*Nowicki Const. Co. v. Panar Corp. N.V.*, 342 Pa.Super. 8, 492 A.2d 36 (1985).

> We must always bear in mind that this is not a common law action, but rather a claim to assert a peculiar type of lien against real estate under the provisions of a statute, strict compliance with which has always been demanded ... Consequently, they are available only on such terms as the Legislature saw fit to provide. (citations omitted) ... The right to file a mechanics' lien must have a contract as its basis.

*Murray v. Zemon*, 402 Pa. 354, 167 A.2d 253 (1961).

As guidance to the Court we cite *Murray v. Zemon*, 402 Pa. 354, 167 A.2d 253 (1961) which discusses the historical legacy of the Mechanics' Lien laws:

> As pointed out in *Boteler v. Espen*, 1882, 99 Pa. 313, 315, the test of the question involved is found in the

identity of him who incurred the cost of the repairs: "If the landlord, the building was subject to the lien, but if the tenant, it was not." This case .held the written consent required was an absolute consent, consistent with the right to do the work on the credit of the building. While the above case was decided under the provisions of the earlier Mechanics' Lien Act of August 1, 1868, P.L. 1168, we do not believe that the Act of 1901, supra, intended to change the nature of the consent required. If anything, the words in the latter statute are more restrictive ...

And, as pointed out in *Fluke v. Lang*, supra, the very purpose of the Act of 1901 was to protect the owner against the filing of lien claims involving improvements contracted for by the tenant, where the circumstances clearly show that the contractor looked to the tenant for payment at the time the contract was made.

The contractor knew who the record owners of the property were. With this knowledge, he contracted in writing with the tenant for payment. *No facts were withheld nor any attempt made to mislead. No promise was ever made by the owners to pay for the cost of the improvement. Under such circumstances, estoppel does not lie.* (emphasis added)

*Murray v. Zemon*, supra, 402 Pa. at 360, 167 A.2d at 256.

The most recent interpretation of the new Mechanics' Lien Act of 1963 was thereafter discussed in *Chambers v. Todd Steel Pickling, Inc.*, 323 Pa.Super. 119, 470 A.2d 159 (1983)

According to the explanatory comments of the Joint State Government Commission, [Section 4 of the Mechanics' Lien Act of 1901] does not appear in the Mechanics' Lien Law of 1963 because if was omitted as unnecessary. Despite the fact that Section 4 of the Act of 1901 is not found in the present statue, we find the interpretation given Section 2 of the Act persuasive in interpreting the nearly identical language of 49 P.S. § 1303(d). As indicated by the Supreme Court in *Murray*, supra, which

interpreted Section 2 of the Act of 1901, an estoppel theory may be sustained in certain situations. In *Murray*, supra 402 Pa. at 361, 167 A.2d at 257 estoppel did not lie because the contractor was under a duty to inquire into the nature of the consent given by the owner to the tenant with regard to the improvements made to the property ... estoppel would not lie against the property owner because the contractor, knowing who the record owners were, contracted in writing with the tenant for payment ... However, where the president and *sole* stockholder of the corporate owner of the property leads a contractor to believe that he is the actual property owner, we believe that the duty to inquire announced in *Murray* cannot be imposed. (emphasis in original)

*Chambers v. Todd Steel Pickling Inc.* supra, 323 Pa.Superior Ct. at 128, 470 A.2d at 163.

The Court in *Chambers* found that the interpretation given Section 2 of the Act of 1901 is nearly identical to the language of 49 P.S. § 1303(d) of the Act of 1963. The Court stated the following when discussing the interpretation of the Mechanics' Lien Act of 1963:

It has been held that "while an owner may consent to his tenant's improvement of the property, without assuming any liability for the work done, *provided he acts in good faith throughout,* he cannot escape such liability if he knows of the tenant's intention to make a contract 'acting as if he were the owner'..." (Emphasis in original) *Fluke v. Lang,* 283 Pa. 54, 57 128 A. 663, 664 (1925). In *Fluke v. Lang,* supra, the Court was interpreting Section 2 of the Mechanics' Lien Act of 1901, replaced by 49 P.S. § 1303d, in conjunction with Section 4 of the 1901 Act, which was omitted from the Mechanics' Lien Law of 1963. Section 4 of the Mechanics' Lien Act of 1901 provided:

Any owner, not being a committee, guardian or trustee, as aforesaid, who shall knowingly suffer or permit any person, acting as if he were the owner, to make a contract for which a claim could be filed, without ob-

jecting thereto at the time, shall be treated as ratifying the act of such person acting as if he were the owner, and the claim may be filed against the real owner, with the same effect if himself had made the contract. Ratification shall also be presumed, and like subjection to lien shall follow, if the owner, not being a committee, guardian or trustee, as aforesaid, subsequently learning of such contract or of work being done upon his property, shall not, within ten days thereafter, repudiate the same, either by notice to the contractor and subcontractors or by posting such repudiation on the most public part of the structure or other improvement . . .

Despite the fact that Section 4 of the Act of 1901 is not found in the present statue, we find the interpretation given Section 2 of the Act persuasive in interpreting the nearly identical language of 49 P.S. § 13030(d). The deposition testimony submitted to the court below raises a serous question concerning the good faith of Todd Steel throughout the instant transaction.

As indicated by the Supreme Court in *Murray*, supra, which interpreted Section 2 of the Act of 1901, as estoppel theory may be sustained in certain situations. In *Murray*, estoppel did not lie because the contract was under a duty to inquire into the nature of the consent given by the owner to the tenant with regard to the improvements made to the property. *Murray, supra*, 402 Pa. at 361, 167 A.2d at 257. The Supreme Court held that estoppel *would not lie against the property owner because the contractor, knowing who the record owners were, contracted in writing with the tenant for payment.* We are mindful of the fact that the law requires strict compliance with statutes governing the right to assert a lien against real estate. *Murray, supra*, 402 Pa. at 358, 167 A.2d at 255. However, where the president and sole stockholder of the corporate owner of the property leads a contractor to believe that he is the actual property

owner, we believe that the duty to inquire announced in *Murray*, cannot be imposed. (Emphasis added)

*Chambers v. Todd Steel Pickling, Inc.*, 323 Pa.Super. 119, 470 A.2d 159, 163–64 (1983).

In *Chambers*, the president, and sole stockholder of the corporation which owned the leased land, led the contractor to believe that he was the actual owner of the land. He contracted to have a residential structure constructed and did not disclose that the land was leased to him by the corporation and that the corporation owned the property. The Supreme Court pierced the corporate veil in *Chambers* and stated the "president contracted for improvements to property which he knew belonged to a corporation he owned, . . . which would accrue to the immediate use and benefit of both himself and the corporation." *Chambers*, supra, 323 Pa.Superior Ct. at 129, 470 A.2d at 164.

■ Instantly, in review of the case at hand the language below will be the boundary mark for this Court's inquiry. The owner of leased property may be found liable for the improvements a tenant has made if the owner has "not acted in good faith throughout the transaction knowing that the tenant intends to make a contract acting as if he were the owner." *Chambers*, supra, 323 Pa.Superior Ct. at 127, 470 A.2d at 161. Where facts are withheld and any attempt is made to mislead the contractor and the owner has promised to pay for the cost of the improvements, the theory of estoppel will lie. *Murray*, supra, 402 Pa. at 127, 167 A.2d at 256.

■ The record reveals that, during the bidding stage and at the time the contract was signed, the Thompsons stated to Mr. Kelly that Mr. Hannan had given the property to them so they could build a home. The Hannans and the Thompsons admitted that the land was given to the Thompson for the purpose of building a home. However, the parties did not state to Mr. Kelly that the land had been conveyed or transferred. The purpose of the lease was to protect the Hannans' interest in the property, and, in the event that the Thompsons were unable to continue living on

the property, Mr. Hannan stated that he wanted the property to revert back to him. Mr. Kelly admitted that he did not check any records to determine if the Hannans had conveyed title to the property to the Thompsons prior to the signing of the contract.

Mr. Kelly entered into the contract with the Thompsons and the Hannans made no promise to pay the costs of the improvements to the property. *See Murray v. Zemon*, 402 Pa. 354, 358–59, 167 A.2d 253, 257 (1961) ("If the contractor desired to subject the estate of the owner to such a lien, it was his duty to inquire into the nature of the consent given, if any. His failure to do so is his fault alone.") The following excerpt of the record is Mrs. Thompson describing her father's involvement in the payment of the construction contract:

Q. Can you please tell me whether or not your father, Charles Hannan, paid for any of your construction?
A. Yes, he did.
Q. And out of the $229,000, can you give me a fair estimate of what percentage your father would have paid?
A. Let me think. Approximately around $50,000.
Q. $50,000,—would the $50,000 have been payments that your father, Charles Hannan, and your mother, Nancy L. Hannan, made directly to Mr. Kelly?
A. No. My mother was not involved in any payments.
Q. Where did the payments come from?
A. My father had given the money to me and I gave it to Mr. Kelly.
Q. Did your father take the money out of his Reese's Wholesale account?
A. I have no idea.
Q. You weren't there when he made these transfers.
A. No I wasn't.
Q. You don't remember how it was your father gave you $50,000?
A. He gave me the money.

Q. In cash?

A. It wasn't in one lump sum, no, it was not in one lump sum. When Mr. Kelly would come for a draw, either the bank,—I'd get the money from the bank or from my account, or we would write one out of my father's account, depending on what my father and I had discussed.

Q. All right, so it either came from the bank,—what bank?

A. Smithfield Bank.

Q. So, you're saying there were checks made to Mr. Kelly from the Smithfield Bank?

A. I would say one or two.

Q. Was Mr. Kelly told that some of the loan was going to come from the bank?

A. Oh, yes.

Q. You're saying—then, there would be several checks from Reese's Wholesale?

A. No.

Q. Well, there would be money that went into your account from Reese's Wholesale?

A. From Reese's Wholesale? I don't think they have anything to do with it.

Q. Your father's personal account, then?

A. I would imagine it would be out of his personal.

Q. Don't imagine. Tell me what it was.

A. Some of it was cash. I have no idea.

Q. How much—

A. I have no idea whether he took it out of the business or not,—I have no idea.

Q. Well, the checks you would have some idea.

A. Right.

Q. Your recollection is what?

A. Okay, the money he gave me was cash to pay.

Q. All right, so there were no checks?

A. From what I can remember,—we have one account with Terri L. Hannan and Charles Hannan on it. He might have gotten one from it you know.

Q. But the rest of the $50,000 was cash that your father gave you?

A. Right ...

Q. Were you present at anytime when your father gave Mr. Kelly cash?

A. My father never gave Mr. Kelly cash. I went back to the office. I counted it out in front of Mr. Kelly, and I gave it to him.

Q. If I understand you correctly, then, out of this $229,-000, about $50,000 was given to Mr. Kelly in cash?

A. Approximately.

(N.T. deposition 3/1/88 pp. 51–54)

The appellant argues that the Thompsons were acting as the owners of the property, and the Hannans may not escape liability because they knew of the Thompsons' intention to enter into this contract acting as if they were the owners. Mr. Hannan did not agree with the appellant to pay the costs of the improvements, but the record reveals that $50,000.00 was deposited by Mr. Hannan into a banking account which he held jointly with Mrs. Thompson for the costs of the construction. The Thompsons told Mr. Kelly that the cost of the construction was being financed through a bank, and the record reveals that the Thompsons' mortgage was approved by the bank even though they were not the legal owners of the property. Mr. Hannan was an active member of the board of directors of the issuing bank. He did not co-sign the loan issued to the Thompsons. Periodically, Mr. Hannan supervised the construction and never indicated that the construction was unauthorized.

In conclusion, the language of the lease is not ambiguous and the document is not reasonably subjected to two different meanings. Terri Thompson stated that she did not know that there had been a lease typed at the time of her deposition which was nearly two years after the construction contract was entered into with Mr. Kelly. The appellees contend that builders have a duty to inquire into the nature of the consent given by the owner to the tenant with regard to the improvements made to the property. The

record reveals that the typed leasing agreement produced at the hearing was not in existence on April 28, 1986, when Mr. Kelly contracted with the Thompsons. Also, during discovery the handwritten lease and typed lease were not mentioned or produced prior to the hearing. It is clear a lease was produced at the time of the hearing. However, the attorney representing the appellee who typed the lease was unable to state on the record when the lease came into existence.

Further, Mr. Kelly was told by the Thompsons and the Hannans that the land had been given to the Thompsons for their use. The record reveals that the normal incidents of ownership such as the mortgage, building and sewage permits and surveying requests were either requested or held by the Thompsons.

Presently, we find the contractor believed that he was contracting with the owners of the property and the Hannans knew of the Thompsons' intentions to contract with Mr. Kelly as though they were the owners. In *Murray,* supra, the Supreme Court stated that estoppel would not lie because there were no facts withheld nor any attempt made to mislead the contractor. The circumstances surrounding the mortgage were misleading as to the ownership of the property. The Thompsons admittedly misrepresented themselves as the owners of the property on various permits. The Court in *Chambers* found that an owner may consent to his tenant's improvement of the property, without assuming any liability for the work done, provided he acts in good faith throughout the transaction. But he cannot escape such liability if he knows of the tenant's intention to make a contract acting as if he he were the owner. The leasing agreement entered into in this case does not engage the language of 49 P.S. § 1303(d) wherein the owner of the estate in fee is protected from liability. We believe the appellee failed to act with good faith throughout the transaction and produced a lease at the time of the hearing in order to engage the language of § 1303(d). Had the typed lease been in existence at the time of the filing of the

appellant's mechanic lien, it would have been produced during discovery.

For these reasons stated above we reverse the lower court's order granting the appellees' preliminary objections.