Barbara Lichtman TAYAR, Appellant

v.

CAMELBACK SKI CORPORATION, INC. and Brian Monaghan.

Superior Court of Pennsylvania.

Argued Feb. 21, 2008.

Filed Sept. 4, 2008.

Barbara Axelrod, Philadelphia, for appellant.

Hugh M. Emory, Paoli, for appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, ORIE MELVIN, BENDER, BOWES, GANTMAN, PANELLA, DONOHUE and ALLEN, JJ.

OPINION BY PANELLA, J.:

¶ 1 This case once again raises issues concerning the enforceability of releases relating to recreational activities provided by commercial entities. Appellant, Barbara Lichtman Tayar, appeals from the order entered on March 31, 2006, in the Court of Common Pleas of Monroe County, that granted the motion for summary judgment filed by Appellees, Camelback Ski Corporation, Inc. and Brian Monaghan.

¶ 2 In this case involving snow tubing, the exculpatory language is contained in a release which the facility requires the customer to sign prior to using the facilities, as well as in a lift ticket which is unsigned. We conclude that the phrase "negligence or any other improper conduct," when used in a release of liability, absent other warnings, does not clearly convey an intent on the part of the releasor to waive all claims against the facility for reckless or intentional conduct. Because, at this stage of the litigation, there is no other evidence capable of establishing that Tayar intended to surrender her right to pursue a claim based upon allegations of recklessness, we find that the exculpatory clause does not immunize Appellees from Tayar's complaint. Consequently, we reverse and remand.

¶ 3 Because the outcome of these cases is often factually specific, we begin with a review of the certified record. On December 20, 2003, Tayar and her children were snow tubing at a facility operated by Camelback Ski Corporation. The Camelback facility offered at least two different options under which customers could snow tube. One set of snow tubing slopes granted customers relatively uncontrolled access to multiple snow tube slopes. All of these slopes ended in a single common area at the base of the mountain.

¶ 4 In contrast, two of the snow tubing slopes were separated from the uncontrolled slopes. These two slopes were identified as family tubing slopes. On these slopes, access was controlled by an attendant employed by Camelback. The attendant was charged with the responsibility of ensuring that the previous tube occupants had traveled the entire slope

and had been cleared from the segregated receiving area at the base of the mountain before starting the next tube down the slope. Furthermore, the family slopes ended in a restricted receiving area at the bottom of the mountain that was not mixed with the common area used by the other slopes.

¶ 5 Tayar arrived at the Camelback facility in the early afternoon. Prior to her family's initial ride down the mountain, Tayar spent some time observing the family tubing area. After observing the family tubing area and concluding that it was operating as promised, Tayar took her family to the top of the mountain to begin their afternoon of snow tubing. Tayar and her family made approximately four successful runs down the family slopes without any incident.

¶ 6 After returning to the top of the mountain to begin another snow tubing run, Tayar was greeted by Brian Monaghan, who was the employee designated by Camelback to control entry onto that family slope. Monaghan gave them the slight push necessary to start them down the slope. The Tayars arrived without incident at the bottom of the slope in the segregated receiving area; after coming to a complete stop, Tayar stood up from the snow tube. At that moment, Tayar was hit by another snow tube.

¶ 7 Tayar felt a bone in her leg break, and fell to the ground. Camelback employees came rushing over to assist Tayar when yet another tube came careening down the slope, only missing Tayar because the attendants had quickly moved her. At this point several Camelback employees were frantically calling and gesturing for Monaghan to stop sending tubes down the slope, while others were attempting to assist Tayar.

¶ 8 Tayar suffered multiple comminuted fractures of her right leg, for which she underwent orthopedic surgery. Eventually, two metal plates and 14 screws were necessary to stabilize her right ankle.

¶ 9 Tayar initiated suit against appellees by way of a complaint filed in the Court of Common Pleas of Monroe County on January 6, 2005. Appellees filed an Answer and New Matter on February 11, 2005, in which, *inter alia*, they claimed that they were relieved of liability by the liability release which Tayar had signed prior to purchasing her lift ticket. Both parties subsequently engaged in discovery, and on February 2, 2006, Appellees filed a motion for summary judgment, asserting that Tayar's claims were barred by the release. Tayar filed her answer to the motion for summary judgment on February 17, 2006. On March 31, 2006, the trial court granted the Appellees' motion. This timely appeal followed.

¶ 10 On appeal, Tayar raises the following issues for our review:

I. Is a personal injury claim barred where (a) the resort's release identified the expected risks of snow tubing as common physical conditions of the premises and conduct of the snow tubers, neither of which caused plaintiff's injuries; and (b) her injuries were caused by an employee's unexpected wrongful acts which created a dangerous situation that was not supposed to exist on the family tubing chutes?

. . .

II. Is a claim for injuries caused by the reckless and/or grossly negligent acts of an employee barred by a release which (a) did not mention any wrongful acts of the resort's employees in its list of the common and expected risks of snow tubing; and also (b) did not say anything

about the employees' reckless or grossly negligent acts?

. . .

III. Is suit against a ski resort's employee for his wrongful acts barred where (a) the release named "Camelback Ski Corporation" as the sole released party; (b) the only mention of releasing "employees" was in small print at the bottom of a folded ticket the injured party had not read or signed; (c) the ticket stated that the snow tuber "agrees to accept the risks of snowtubing" listed in the ticket, but the accident was not caused by one of the expected risks of snow tubing; (d) the accident was caused by the employee's unanticipated wrongful acts, which created a dangerous situation that was not supposed to exist; and (e) the ticket only talked about suing "regardless of any negligence of Camelback or its employees" and did not mention recklessness or gross negligence?

Appellant's Brief, at 3.

¶ 11 Our standard and scope of review on appeal from the grant of a motion for summary judgment are well-settled.

Our scope of review of a trial court's order disposing of a motion for summary judgment is plenary. Accordingly, we must consider the order in the context of the entire record. Our standard of review is the same as that of the trial court; thus, we determine whether the record documents a question of material fact concerning an element of the claim or defense at issue. If no such question appears, the court must then determine whether the moving party is entitled to judgment on the basis of substantive law. Conversely, if a question of materi-

al fact is apparent, the court must defer the question for consideration of a jury and deny the motion for summary judgment. We will reverse the resulting order only where it is established that the court committed an error of law or clearly abused its discretion.

*Estate of Higgins ex rel. Higgins v. Washington Mut. Fire Ins. Co.,* 838 A.2d 778, 780–81 (Pa.Super.2003) (citation omitted).

¶ 12 We begin by addressing the trial court's grant of summary judgment in favor of Monaghan. "Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions." *Grandelli v. Methodist Hospital,* 777 A.2d 1138, 1144 (Pa.Super.2001). Summary judgment is properly granted as a matter of law

if, after the completion of discovery relevant to the motion . . ., an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P., Rule 1035.2, 42 PA. CONS.STAT. ANN. The adverse party who bears the burden of proof at trial must come forward with evidence essential to preserve his cause of action. *Id.,* Note. If such a party fails to produce such essential evidence, the moving party is entitled to judgment as a matter of law. *Grandelli,* 777 A.2d at 1143–44 (citation omitted). However, we must review the record in the light most favorable to the nonmoving party and resolve all doubts against the moving party. *Id.*

¶ 13 We may only disturb the trial court's grant or denial of summary judgment upon an error of law or an abuse of discretion.

An abuse of discretion exists when the trial court has rendered a judgment that

is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will.... Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion.

*Harman ex rel. Harman v. Borah,* 562 Pa. 455, 469, 756 A.2d 1116, 1123 (2000) (quotation marks and citations omitted).

¶ 14 In granting summary judgment to Monaghan, the trial court held that the following language, found on the reverse side of Tayar's lift ticket, constituted a voluntary waiver of liability on the part of Tayar:

**PLEASE READ! Acceptance of this ticket and the Acknowledgement Not to Sue that you have just signed constitute a contract.** Snowtubing, including the use of lifts, is a dangerous sport with inherent and other risks. These risks include but are not limited to those risks outlined in the Acknowledgement of Risks you have signed. All of the inherent and other risks of snowtubing present the risk of serious and/or fatal injury.

**In consideration of using Camelback's snowtubing facilities, the purchaser or user of this ticket agrees to accept the risks of snowtubing and agrees not to sue Camelback or its employees if hurt while using the snowtubing facilities regardless of any negligence of Camelback or its employees or agents.**

The purchaser or user of this ticket voluntarily assumes the risk of injury while participating in this sport and agrees to abide by the rules and regulations of the snowtubing park.

Motion for Summary Judgment, 2/2/2006, Exhibit D (emphasis in original).

¶ 15 As Appellees concede, the release contained on the reverse side of the lift ticket is controlled by our prior decision in *Beck–Hummel v. Ski Shawnee, Inc.,* 902 A.2d 1266 (Pa.Super.2006), as the lift ticket is not attached to a signed release. Appellees' Brief, at 26–27. In *Beck–Hummel,* this Court held that summary judgment on the basis of an unsigned waiver of liability was inappropriate, absent evidence that the customer was made aware of the release language. *Id.,* at 1275.

¶ 16 In their brief, Appellees argue that *Beck–Hummel* is distinguishable from the present case based on the presence of two signs hung over the lift ticket windows at the Camelback ski resort. Appellees attached a picture of these signs to their motion for summary judgment, and Tayar, in her response, admitted that the signs were on the building. *See* Motion for Summary Judgment, 2/2/2006, Exhibit C; Plaintiff's Response, 2/17/2006, at ¶ 3. However, the content of the relevant signs is not clear from the picture attached to the motion for summary judgment. The words "PLEASE READ" can be made out at the top of the signs, but the significantly smaller, denser text below these admonitions cannot be deciphered. Nor does the record contain any evidence of what these signs contain.

¶ 17 In an attempt to remedy this deficiency, Appellees attach close-up photographs of the two signs as "Exhibit C" to their brief on appeal. Appellees' proposed remedy, however, must fail as documents which are not part of the certified record on appeal are "considered to be non-existent.... And, these deficiencies may not be remedied by inclusion in a brief." *Lundy v. Manchel,* 865 A.2d 850, 855 (Pa.Super.2004) (quotation marks and citation omitted). "It is well settled that an appellate court may consider only those facts which have been duly certified in the record on appeal." *Id.* Moreover, there is

nothing in the record which indicates that "Exhibit C" was before the trial court. Accordingly, the content of the signs beyond "PLEASE READ" cannot be considered for purposes of this appeal.

■ ¶ 18 We are therefore left with the following facts concerning the exculpatory language contained in the fine print on the reverse side of the lift ticket. First, Tayar did not receive the ticket until after she had signed the release form and paid an entry fee. N.T., 9/22/2005, at 31. Tayar did not recall if she had read any part of the ticket. *Id.*, at 30. Moreover, there is no evidence that Tayar was verbally informed that she was bound by the language on the back of the ticket. As in *Beck–Hummel,* the disclaimer language on the ticket, as evidenced by the photocopy attached to the motion for summary judgment, is just barely legible. The larger text on the ticket is reserved for the Camelback logo, as well as "NON–TRANSFERABLE," "NOT FOR RESALE," "VOID IF DETACHED," and "NON–REFUNDABLE," as well "Tubing Area Use Ticket," and "2003–2004 Season." Over half of the front of the ticket is reserved for a date stamp. Even the website address for Camelback is printed in a larger font size than the disclaimer language. As in *Beck–Hummel,* "[w]e cannot conclude as a matter of law that the disclaimer language on the ticket itself was sufficiently conspicuous such that, without any further indications from the ski facility, a purchaser would be put on notice of its contents." *Beck–Hummel,* 902 A.2d at 1275. Accordingly, we conclude that the trial court erred in finding that Monaghan is shielded from liability by the language on the lift ticket.

■ ¶ 19 Appellees argue in the alternative that the form release signed by Tayar constitutes a waiver of any claim Tayar might have against Monaghan. The Supreme Court of Pennsylvania has had prior occasion to summarize the law regarding exculpatory agreements, and it is generally accepted that an exculpatory clause is valid where three conditions are met:

> First, "the clause must not contravene public policy . . .";
>
> Second, "the contract must be between persons relating entirely to their own private affairs . . ."; and
>
> Third, "each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion. . . ."

*Topp Copy Products, Inc. v. Singletary,* 533 Pa. 468, 471, 626 A.2d 98, 99 (1993). The Supreme Court has noted, however, that "once an exculpatory clause is determined to be valid, it will, nevertheless, still be unenforceable unless the language of the parties is clear that a person is being relieved of liability for his own acts of negligence." *Id.*

¶ 20 Furthermore, in interpreting such clauses, the Supreme Court provided a list of guiding standards:

(1) the contract language must be construed strictly, since exculpatory language is not favored by the law;

(2) the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties;

(3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and

(4) the burden of establishing immunity is upon the party invoking protection under the clause.

*Id. See, e.g., Valhal Corporation v. Sullivan Associates, Inc.,* 44 F.3d 195 (3d Cir. 1995).

¶ 21 The form release signed by Tayar before she engaged in any snow tubing activities stated:

CAMELBACK SNOWTUBING AC-KNOWLEDGEMENT OF RISKS AND AGREEMENT NOT TO SUE THIS IS A CONTRACT—READ IT

I understand and acknowledge that snowtubing, including the use of lifts, is a dangerous, risk sport and that there are inherent and other risks associated with the sport and that all of these risks can cause serious and even fatal injuries. I understand that part of the thrill, excitement and risk of snowtubing is that the snowtubes all end up in a common, runout area and counter slope at various times and speeds and that it is my responsibility to try to avoid hitting another snowtuber and it is my responsibility to try to avoid being hit by another snowtuber, but that, notwithstanding these efforts by myself and other snowtubers, there is a risk of collisions.

I acknowledge and understand that some, but not necessarily all, of the risks of snowtubing include the following:

- Variations in the steepness and configuration of the snowtubing chutes, runout area, and counter slope, and the surface upon which snowtubing is conducted, which can vary from wet, slushy conditions to hard packed, icy conditions and everything in between;
- Fences and/or barriers at or along portions of the snowtubing area, the absence of such fences and/or barriers and the inability of fences and/or barriers to prevent or reduce injury;
- Changes in the speed at which snowtubes travel depending on surface conditions, the weight of snowtubers and the inter-linking of snowtubes together to go down the snowtube runs;
- The chance that a patron can fall out, be thrown out or otherwise leave the snowtube;
- The chance that a snowtube can go from one run into another run, regardless of whether or not there is a barrier between runs, and the chance that a snowtube can go up and over the counter slope;
- The chance that a snowtube can go up the counter slope and then slide back into the general runout area;
- Collisions in the runout area or counter slope and other locations of the snowtubing facility, between snowtubes, between a snowtube and another person, between a snowtube and a snowtubing facility attendant, collisions with fixed objects, obstacles or structures located within or outside of the snowtubing facility, and other sorts of collisions; and
- The use of the snowtubing lift or tow, including falling out of a tube, coasting backwards, becoming entangled with equipment and other risks.

I acknowledge and understand that I am accepting AS IS the snowtube and any other equipment involved with the snowtubing activity, including lifts and tows, and further acknowledge and understand that NO WARRANTIES are being extended to me with respect to any aspect of the snowtubing facility. I agree and understand that snowtubing is a purely voluntary recreation activity and that if I am not willing to acknowledge the risks and agree not to sue, I should not go snowtubing.

IN CONSIDERATION OF THE ABOVE AND OF BEING ALLOWED TO PARTICIPATE IN THE SPORT OF SNOWTUBING, I AGREE THAT I WILL NOT SUE AND WILL RELEASE FROM ANY AND ALL LIABILITY CAMELBACK SKI CORPO-

RATION IF I OR ANY MEMBER OF MY FAMILY IS INJURED WHILE USING ANY OF THE SNOWTUBING FACILITIES OR WHILE BEING PRESENT AT THE FACILITIES, EVEN IF I CONTEND THAT SUCH INJURIES ARE THE RESULT OF NEGLIGENCE OR ANY OTHER IM- PROPER CONDUCT ON THE PART OF THE SNOWTUBING FACILITY. I FURTHER AGREE THAT I WILL INDEMNIFY AND HOLD HARM- LESS CAMELBACK SKI CORPORA- TION FROM ANY LOSS, LIABILITY, DAMAGE OR COST OF ANY KIND THAT MAY INCUR AS THE RE- SULT OF ANY INJURY TO MYSELF, TO ANY MEMBER OF MY FAMILY OR TO ANY PERSON FOR WHOM I AM SIGNING THIS AGREEMENT, EVEN IF IT IS CONTENDED THAT ANY SUCH INJURY WAS CAUSED BY THE NEGLIGENCE OR OTHER IMPROPER CONDUCT ON THE PART OF CAMELBACK SKI CORPO- RATION. Notwithstanding the forego- ing, if I sue Camelback Ski Corporation, I agree that I will only sue it, whether it be on my own behalf or on behalf of a family member, in the Court of Common Pleas of Monroe County or in the Unit- ed State District Court for the Middle District of Pennsylvania and further agree that any and all disputes which might arise between Camelback Ski Corporation and myself shall be litigated exclusively in one of said Courts. I understand and agree that this Agree- ment is governed by the laws of Penn- sylvania. I further agree that if any part of this Agreement is determined to be unenforceable, all other parts shall be given full force and effect.

I have read and understood the forego- ing ACKNOWLEDGEMENT OF RISKS AND AGREEMENT NOT TO SUE and am voluntarily signing below, intending to be legally bound hereby. If I am signing on behalf of a minor child, I represent and warrant that I am doing so with the consent and approval of my spouse (if any) and I understand that I may be giving up the rights of my child and spouse to sue as well as giving up my own right to sue.

Motion for Summary Judgment, 2/2/2006, Exhibit A.

¶ 22 As mentioned previously, this form release does not explicitly purport to ex- culpate Camelback's employees from lia- bility in their own capacity: "I WILL NOT SUE AND WILL RELEASE FROM ANY AND ALL LIABILITY CAMELBACK SKI CORPORATION." In light of Monaghan's burden of estab- lishing that the release provides him with immunity from suit, combined with the standard that the language of the form agreement must be construed strictly and against Monaghan, we conclude that the form agreement does not, with the "great- est particularity," exculpate Monaghan in his personal capacity.

¶ 23 Appellees argue that since Camelback is a corporation, it can act only through its employees, agents, and offi- cers. This premise is well settled in our law. *See Lokay v. Lehigh Valley Co-op. Farmers, Inc.*, 342 Pa.Super. 89, 492 A.2d 405, 408–410 (1985) ("A corporation is a creature of legal fiction, and must 'act' through its officers, directors or other agents."). However, in terms of this type of case, it is an inapposite contention. A corporation is a separate, fictional legal person distinct from its shareholders or employees. *See Viso v. Werner*, 471 Pa. 42, 49, 369 A.2d 1185, 1188 (1977) ("Nor are we persuaded that because the corpo- ration in the instant case was operated by the appellant as sole shareholder, its inde- pendent identity should be ignored.").

When a corporation enters into a contract, it does so only on behalf of its separate, fictional capacity, unless the contract or circumstances explicitly state otherwise. *See id.; Electron Energy Corp. v. Short,* 408 Pa.Super. 563, 597 A.2d 175 (1991) (corporation's president was not a party to a contract he signed in his capacity as agent for the corporation), *aff'd,* 533 Pa. 66, 618 A.2d 395 (1993). In the same vein, a corporate officer may be held individually liable for torts committed while acting within the scope of his employment by the corporation. *Wicks v. Milzoco Builders, Inc.,* 503 Pa. 614, 620, n. 5, 470 A.2d 86, 89, n. 5 (1983). As a result, Appellees' argument that an agreement exculpating a corporation necessarily exculpates the corporation's employees in their individual capacities is patently meritless.

█ ¶ 24 Appellees argue in their brief that a "common sense reading" of the form release agreement reveals that Tayar agreed to release Monaghan, in his personal capacity, from liability. However, far from being common sense, an interpretation of the release agreement that immunizes Monaghan would require not only inserting language identifying employees as released parties, but also language that absolves Monaghan of liability for his reckless conduct.[1]

█ ¶ 25 Reckless conduct has been defined as follows:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Hutchison ex rel. Hutchison v. Luddy,* 896 A.2d 1260, 1265–1266 (Pa.Super.2006) (quotation marks and citation omitted). In other words, to establish a reckless state of mind, a plaintiff must prove that the defendant knew or had reason to know that 1) his conduct created an unreasonable risk of harm to another; and 2) that the risk created by his conduct was substantially greater than the risk necessary to establish negligence.

¶ 26 In the present case, Monaghan gave the following deposition testimony regarding his duties as an employee at Camelback:

Q. Do you specifically remember your training going down the family tubes?

A. Yes.

Q. What did they tell you to do regarding the safety?

A. Before you send the tube down with somebody in it, you have to look down at the bottom to make sure that the pathway was clear before you sent another tube down.

Q. Why did you have to do that?

A. So nobody got hurt.

N.T., 10/25/2005, (Brian Monaghan) at 12. Monaghan further testified that not only had he been trained that very morning by senior Camelback employees regarding the family slopes, but that he had also read the Tubing Park Operations Manual. *Id.,* at 10; 14. Monaghan specifically testified that he had read and understood the requirement, contained in the Operations Manual, that a family slope tubing attendant "will

---

1. In the Complaint, Tayar alleges that Monaghan was "reckless and unmindful of [Taylar's] safety and health ..." and was therefore liable for his "carelessness and recklessness...." Complaint, ¶¶ 25–26.

not allow family tube riders to leave the starting position until the previous tube riders have reached the bottom and exited the chute." *Id.,* at 14.

¶ 27 At this stage of the litigation, this evidence is sufficient to support a reasonable inference that Monaghan was aware of the substantially increased risk of injury that could occur if he sent a tube down the family slope before ensuring that the occupants of the prior tube had left the slope. In fact, Monaghan admitted that he was aware that it was his duty to prevent just such accidents from occurring on the family slopes. As such, Tayar has satisfied the first requirement for proving that Monaghan acted recklessly.

¶ 28 Monaghan also testified that from his position at the top of the slope, he could see the bottom of the slope. *Id.,* at 13. He could see snow tubers getting into and out of the tubes at the bottom of the slope. *Id.* Monaghan's supervisor at Camelback on the date of the accident, Ian Amato, also testified at a deposition that an operator in Monaghan's position had a clear view of the entire slope. N.T., 10/25/2005 (Ian Amato), at 20. According to Amato, the Camelback employee has complete control and responsibility for when each tube goes down a family slope; the tubers themselves have no control over the process. *Id.,* at 14–15.

¶ 29 Most importantly, with respect to the incident at issue, Monaghan testified that

I remember sending the tube down, and then I didn't really pay attention to see if the people had gotten out of the tube or whatnot, and I sent another tube down, and maybe I sent one more down. I don't really remember. I know I sent at least one more down.

N.T., 10/25/2005, (Brian Monaghan), at 14. When asked whether he knew that it was wrong to send another tube down the slope without ensuring that the previous tube had exited, Monaghan admitted that he knew it was wrong, but claimed that he had not intended to harm Tayar.[2] *Id.,* at 16. Taken in its entirety, this evidence is more than sufficient to allow for a reasonable inference that Monaghan was aware that the risk posed by his actions was a substantial one. Accordingly, we conclude that Tayar has provided sufficient evidence to establish a *prima facie* case of reckless conduct on the part of Monaghan.

¶ 30 Appellees argue that, even if Monaghan's conduct amounted to recklessness, the release signed by Tayar precluded liability. Appellees specifically focus on the following partial sentence contained in the release:

IN CONSIDERATION OF THE ABOVE AND OF BEING ALLOWED TO PARTICIPATE IN THE SPORT OF SNOWTUBING, I AGREE THAT I WILL NOT SUE AND WILL RELEASE FROM ANY AND ALL LIABILITY CAMELBACK SKI CORPORATION IF I OR ANY MEMBER OF MY FAMILY IS INJURED WHILE

---

2. Of course, application of the *Nanty–Glo* rule prohibits the entry of summary judgment based on the deposition testimony of Monaghan. The trial court reasoned that Monaghan's testimony absolved him of any allegation that he had acted recklessly. Trial Court Opinion, 3/31/06, at 11–12. However, the *Nanty–Glo* rule prohibits summary judgment "where the moving party relies exclusively on oral testimony, either through testimonial affidavits or deposition testimony, to establish the absence of a genuine issue of material fact **except** where the moving party supports the motion by using admissions of the opposing party or the opposing party's own witness." *Lineberger v. Wyeth,* 894 A.2d 141, 149 (Pa.Super.2006) (quotation marks and citations omitted). Here, as stated above, Tayar has presented significant evidence to create an inference that Monaghan acted recklessly.

USING ANY OF THE SNOWTUBING FACILITIES OR WHILE BEING PRESENT AT THE FACILITIES . . . Motion for Summary Judgment, 2/2/2006, Exhibit A. Appellees argue that this partial sentence is an express agreement waiving the right to sue Camelback under any theory of liability. However, it is important to note that the remainder of the sentence states ". . . EVEN IF I CONTEND THAT SUCH INJURIES ARE THE RESULT OF NEGLIGENCE OR ANY OTHER IMPROPER CONDUCT ON THE PART OF THE SNOWTUBING FACILITY." *Id.*

¶ 31 This further language is important as it constitutes a refinement of the clause agreeing not to sue Camelback. It explicitly mentions only negligence, while using a vague phrase of general import, *i.e.*, "other improper conduct," as a catch-all. If we were to accept Camelback's argument, the term "other improper conduct" would preclude liability for a intentional physical assault committed by a Camelback employee during the course of business. It is incongruous to conclude that a customer of Camelback would understand this result from the general language employed by the form release agreement.

¶ 32 Rather, under the facts as established by the record in this case, for the release agreement to have been effective against claims of reckless or intentional conduct, the release agreement had to explicitly state that the releasor was waiving claims based upon allegations of recklessness and intentional conduct. Mere catch-all phrasing, in light of the specific examples provided by Camelback as to the general dangers of recreational snow tubing, was not sufficient to warn putative releasors of the important rights covered by the release. As such, we cannot conclude that, even if we inserted language into the release form that identified employees of Camelback as parties to the contract, the release would immunize Monaghan from Tayar's claims of recklessness.

¶ 33 We therefore conclude that Monaghan was not entitled to summary judgment on the basis of any purported release of liability. Accordingly, the trial court erred in granting Monaghan motion for summary judgment, and we must reverse that portion of the trial court's order.

■ ¶ 34 Turning to Camelback Ski Corporation in its separate legal identity as a defendant, we note that the preceding discussion of the signed release agreement with respect to Monaghan reveals several important ramifications regarding Camelback. First, the release contained on the reverse of the lift ticket was not effective to relieve Camelback of liability pursuant to *Beck–Hummel.* Second, the form release agreement signed by Tayar does explicitly release Camelback from liability that results from its negligence. Further, by necessary implication, the release immunizes Camelback from liability that results from the negligence of its employees, agents and officers.

¶ 35 However, it is also clear from our previous discussion that the signed form release does not explicitly immunize Camelback from liability that results from the reckless or intentional torts committed by its employees or agents. Pursuant to *Topp Copy,* Camelback bears the burden of establishing that the signed form release covered the reckless actions of Monaghan. As the release contains only the term of general import, "other improper conduct," it fails to explicitly and clearly convey that the releasor is surrendering the right to compensation for intentional and reckless torts committed by Camelback employees. These types of allegations clearly fall outside the typical dangers of recreational activities, as all of the

examples in the release relate, and of allegations of ordinary negligence.

¶ 36 Furthermore, we take heed that

[a] court must be careful not to retire into that lawyer's Paradise where all words have a fixed, precisely ascertained meaning; where men may express their purposes, not only with accuracy, but with fullness; and where, if the writer has been careful, a lawyer, having a document referred to him, may sit in his chair, inspect the text, and answer all questions without raising his eyes.

*In re Breyer's Estate*, 475 Pa. 108, 115 n. 5, 379 A.2d 1305, 1309 n. 5 (1977), quoting 3 Corbin on Contracts § 535 n. 16, *in turn quoting* Thayer, *Preliminary Treatise on Evidence* 428. In the present case, while the signed form release explicitly mentions the risk of collisions in the run-off area as one of the risks inherent in the sport of snow tubing, it is also abundantly clear from the circumstances of this case that Camelback created and marketed family slopes as areas where this danger was eliminated. It is significant also that the danger was created not from a passive act or omission but from a volitional act that was a direct violation of company policy. As conceded by Camelback employee Amato at his deposition, if the family slope attendant performs his job properly, the possibility of collisions at the bottom of the slope is eliminated. *See N.T.*, 10/25/2005, (Ian Amato), at 21.

■ ¶ 37 Camelback, as releasee, consciously marketed a service that purported to eliminate a known and typical risk of a recreational activity. Based on the summary judgment record, particularly the testimony of Camelback employees as to the additional safeguards implemented in the area marketed by Camelback as the family tubing slope, we conclude that the trial court erred in granting summary judgment. We are duty bound to resolve all doubts against the moving party as to the existence of a genuine issue of material fact. *Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 465, 926 A.2d 899, 902 (2007). Here, a fair reading of the evidence is that Camelback, despite representations to the contrary, allowed a snow tube to go down the family slope without checking that the prior tube's occupants had left the receiving area. A jury could fairly conclude from such evidence that the defendants acted in "reckless disregard of the safety of another." If a business desires to market a product or service as safer, it should not then be able to disclaim the promise of safety through the use of boilerplate legalese; it must specifically and conspicuously disclaim the promise of safety.

¶ 38 We reverse the summary judgment and remand for further proceedings on the question of whether the defendants' conduct was reckless or intentional, and, if so, whether such conduct caused the injuries to Tayar. As noted previously, we also reverse the trial court's order that granted Monaghan's motion for summary judgment.

¶ 39 Order reversed. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

¶ 40 Judge Bowes files a dissenting opinion in which Orie Melvin, Bender and Gantman, JJ., join.

## DISSENTING OPINION BY BOWES, J.:

¶ 1 I respectfully dissent from the majority's conclusion that the release executed by Barbara Lichtman Tayar is not enforceable in this action. I would affirm the March 31, 2006 order granting summary judgment to Camelback Ski Corporation, Inc. ("Camelback") and Brian Monaghan, Appellees.

¶ 2 Appellant instituted this action to recover damages for injuries she sustained on December 20, 2003, while snow tubing at Camelback. Prior to riding on the amusement, Appellant executed the following release:

CAMELBACK SNOWTUBING AC-KNOWLEDGEMENT OF RISKS AND AGREEMENT NOT TO SUE THIS IS A CONTRACT—READ IT

**I understand and acknowledge that snowtubing, including the use of lifts, is a dangerous, risk sport** and that **there are inherent and other risks associated with the sport** and that all of these risks can cause serious and even fatal injuries. **I understand that part of the** thrill, excitement and **risk of snowtubing is that the snowtubes all end up in a common, runout area** and counter slope at various times and speeds and that it is my responsibility to try to avoid hitting another snowtuber and but that, notwithstanding these efforts by myself and other snowtubers, **there is a risk of collisions.**

**I acknowledge and understand that some, but not necessarily all, of the risks of snowtubing include the following:**

- Variations in the steepness and configuration of the snowtubing chutes, runout area, and counter slope, and the surface upon which snowtubing is conducted, which can vary from wet, slushy conditions to hard packed, icy conditions and everything in between;
- Fences and/or barriers at or along portions of the snowtubing area, the absence of such fences and/or barriers and the inability of fences and/or barriers to prevent or reduce injury;
- Changes in the speed at which snowtubes travel depending on surface conditions, the weight of snowtubers and the inter-linking of snowtubes together to go down the snowtube runs;
- The chance that a patron can fall out, be thrown out or otherwise leave the snowtube;
- The chance that a snowtube can go from one run into another run, regardless of whether or not there is a barrier between runs, and the chance that a snowtube can go up and over the counter slope;
- The chance that a snowtube can go up the counter slope and then slide back into the general runout area;
- **Collisions in the runout area** or counter slope and other locations of the snowtubing facility, between snowtubes, between a snowtube and another person, between a snowtube and a snowtubing facility attendant, collisions with fixed objects, obstacles or structures located within or outside of the snowtubing facility, and other sorts of collisions; and
- The use of the snowtubing lift or tow, including falling out of a tube, coasting backwards, becoming entangled with equipment and other risks.

I acknowledge and understand that I am accepting AS IS the snowtube and any other equipment involved with the snowtubing activity, including lifts and tows, and further acknowledge and understand that NO WARRANTIES are being extended to me with respect to any aspect of the snowtubing facility. **I agree and understand that snowtubing is a purely voluntary recreation activity and that if I am not willing to acknowledge the risks and agree not to sue, I should not go snowtubing.** IN CONSIDERATION OF THE ABOVE AND OF BEING ALLOWED TO PARTICIPATE IN THE SPORT OF SNOWTUBING, **I AGREE THAT I**

WILL NOT SUE AND WILL RE-
LEASE FROM ANY AND ALL LIA-
BILITY CAMELBACK SKI CORPO-
RATION IF I OR ANY MEMBER OF
MY FAMILY IS INJURED WHILE
USING ANY OF THE SNOWTUBING
FACILITIES OR WHILE BEING
PRESENT AT THE FACILITIES,
**EVEN IF I CONTEND THAT SUCH
INJURIES ARE THE RESULT OF
NEGLIGENCE OR ANY OTHER IM-
PROPER CONDUCT ON THE PART
OF THE SNOWTUBING FACILITY.**
I FURTHER AGREE THAT **I WILL
INDEMNIFY AND HOLD HARM-
LESS CAMELBACK SKI CORPORA-
TION FROM ANY LOSS, LIABILI-
TY, DAMAGE OR COST OF ANY
KIND THAT MAY INCUR AS THE
RESULT OF ANY INJURY TO MY-
SELF, TO ANY MEMBER OF MY
FAMILY OR TO ANY PERSON FOR
WHOM I AM SIGNING THIS
AGREEMENT, EVEN IF IT IS CON-
TENDED THAT ANY SUCH INJURY
WAS CAUSED BY THE NEGLI-
GENCE OR OTHER IMPROPER
CONDUCT ON THE PART OF CAM-
ELBACK SKI CORPORATION.** Not-
withstanding the foregoing, if I sue
Camelback Ski Corporation, I agree that
I will only sue it, whether it be on my
own behalf or on behalf of a family
member, in the Court of Common Pleas
of Monroe County or in the United
States District Court for the Middle Dis-
trict of Pennsylvania and further agree
that any and all disputes which might
arise between Camelback Ski Corpora-
tion and myself shall be litigated exclu-
sively in one of said Courts. I under-
stand and agree that this Agreement is
governed by the laws of Pennsylvania.
I further agree that if any part of this
Agreement is determined to be unen-
forceable, all other parts shall be given
full force and effect.

I have read and understood the forego-
ing ACKNOWLEDGEMENT OF
RISKS AND **AGREEMENT NOT TO
SUE** and am voluntarily signing below,
intending to be legally bound hereby. If
I am signing on behalf of a minor child,
I represent and warrant that I am doing
so with the consent and approval of my
spouse (if any) and I understand that I
may be giving up the rights of my child
and spouse to sue as well as giving up
my own right to sue.

Motion for Summary Judgment, 2/2/06,
Exhibit A (emphases added).

¶ 3 Appellant and her children rode
down the chute in a tube until it came to a
stop. As Appellant exited her tube and
began to walk away, she was struck by
another tube and sustained a fractured leg.
Mr. Monaghan, a Camelback employee,
was responsible for ensuring that the pas-
sengers from a tube had cleared the bot-
tom of the chute before permitting the
next tube to enter the chute. During his
deposition in this matter, Mr. Monaghan
admitted that he was not paying proper
attention. Mr. Monaghan stated that he
had not intended to injure Appellant and
had not been aware that she was in danger
of being struck. He explained that he had
been distracted at the time of the incident.

Q.... When [Appellant's] tube reached
the bottom of the hill, you could see
them, I presume?

A. Yes.

Q. And then you sent another tube
down without making sure that the bot-
tom of the hill was clear, right?

A. Yes.

Q. All right. And then did that tube
hit the people at the bottom of the hill?

A. Yes.

Q. So you saw them actually get hit
down at the bottom?

A. I didn't see them get hit because I was just focusing more on what I was trying to do up at the top, you know. I was watching the people, you know. I didn't really pay attention. I didn't really see the lady get hit.

Q. It's fair to say, though, you didn't pay attention to what was going on down at the bottom of the hill; is that correct?

A. Yes.

Q. Before you sent another tube down the bottom of the hill—before you sent another tube down, you didn't look to see whether the area was clear?

A. Yes.

Q. Is that a correct statement?

A. Yes.

Q. All right. And then you sent another tube down?

A. Maybe. I don't know. I don't remember.

Q. You may have?

A. I may have.

Q. Did you know that was wrong to do that?

A. Yes. **I mean, I wasn't doing it on purpose. I didn't do it on purpose to intentionally hit the lady. I just wasn't paying attention. I was focusing on other things. I was thinking about other things.**

Deposition of Brian Monaghan, 10/25/05, at 15–16 (emphasis added).

¶ 4 I disagree with the majority's conclusion that the release did not encompass the conduct in question and that it does not serve to release the employees of Camelback. First, Appellant clearly and unequivocally was informed twice of the risk of collision with another snow tuber, which is the precise event that caused her injury. Second, she agreed to release Camelback even if her injuries resulted from "negligence or other improper conduct." Mr. Monaghan's conduct was negligent and

nothing more. He was being inattentive; I cannot agree with the majority's characterization of Mr. Monaghan's conduct as "reckless" and therefore not subject to the release's language.

¶ 5 *Nissley v. Candytown Motorcycle Club, Inc.*, 913 A.2d 887 (Pa.Super.2006), is instructive. In that case, in order to become a member of a motorcycle club, the plaintiff executed an application that included a release agreement stating he would not sue the club for injuries sustained while on the premises. The plaintiff was subsequently injured when he went over a jump and struck a maintenance vehicle that was hidden from view. He instituted an action to recover damages resulting from his injuries, but the motorcycle club was granted summary judgment based upon the exculpatory language in the executed release. Therein, we examined the legal principles applicable to releases:

The Pennsylvania Supreme Court established the law for interpreting exculpatory agreements in *Employers Liability Assurance Corp. v. Greenville Business Men's Asso.*, 423 Pa. 288, 224 A.2d 620 (1966). The Court held that an exculpatory agreement was valid if: (1) it did not contravene public policy; (2)[it] was between persons and related to their own personal affairs; and (3) the agreement was not a contract of adhesion. *Id.* at 623. Drawing upon its decisions in other cases, it held that the following standards must be met to establish that an exculpatory clause relieves a party of liability: (1) the agreement must be construed strictly since it is not favored by the law; (2) such agreements "must spell out the intention of the parties with the greatest of particularity" and show the intent to release from liability "beyond doubt by express stipulation," because "(n)o infer-

ence from words of general import can establish it"; (3) such agreements "must be construed with every intendment against the party who seeks the immunity from liability"; and (4) "the burden to establish immunity from liability is upon the party who asserts such immunity." *Id.*

*Id.* at 890.

¶ 6 We concluded that since the plaintiff had agreed not to "sue" the defendant for "any injury" suffered while "upon the premises" of the motorcycle club, the release applied to the action in question. In order to overcome the effect of the release, the plaintiff averred that striking a maintenance vehicle was not an inherent risk of riding the motorcycle at the club, and therefore, the release's language should not apply to his injuries. We disagreed, holding that "the explicit, broad, and valid language of the exculpatory clause bars **all** claims, regardless of whether they arise from an inherent risk." *Id.* at 892 (emphasis in original). *Accord Zimmer v. Mitchell & Ness,* 253 Pa.Super. 474, 385 A.2d 437 (1978) *(en banc), affirmed per curiam,* 490 Pa. 428, 416 A.2d 1010 (1980) (enforcing exculpatory clause contained in rental agreement for ski equipment that malfunctioned and caused injuries).[3]

¶ 7 In the present case, the release does not contravene any public policy, and it was related to the personal affairs between the two contracting parties. No one forced Appellant to ride the snow tube on December 20, 2003. It was a voluntary choice made solely for the purpose of engaging in a recreational activity, and Appellant signed an agreement acknowledging this fact. Thus, it was not a

contract of adhesion and should be enforced.

¶ 8 Moreover, the wording of the document applies herein. Appellant agreed not to sue Camelback. She consented to release Camelback "from any and all liability ... while using any of the snow tubing facilities or while being present at the facilities" even if the "injuries are the result of negligence or any other improper conduct" of Camelback. The language in question clearly and unambiguously prevents Appellant from instituting this action.

¶ 9 I also disagree that the record supports an inference that Mr. Monaghan exhibited gross negligence or recklessness. Restatement (2d) of Torts § 500 defines reckless behavior:

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

¶ 10 Mr. Monaghan did not know that Appellant had not cleared the bottom; he was being inattentive and did not intentionally or recklessly harm Appellant by allowing a tuber to enter the chute knowing that Appellant remained in the run-off area. His conduct falls within the parameters of ordinary negligence. In fact, the release language clearly encompasses both negligence and "other improper conduct." My conclusion might differ if Camelback

---

**3.** I also note that our Supreme Court recently granted allowance of appeal in *Chepkevich v. Hidden Valley Resort, L.P.,* 911 A.2d 946 (Pa.Super.2006), *appeal granted,* 593 Pa. 420, 931 A.2d 630 (2007), wherein a panel of this Court refused to enforce language similar to that at issue herein that was contained in a release that a skier had executed.

continued to employ Mr. Monaghan after he had a history of prematurely sending snow tubes down the chute or if Mr. Monaghan had allowed the second tube to proceed for sport, knowing that Appellant had not cleared the area, in order to see if she might avoid injury when he sent down the next tube. These later examples constitute reckless behavior and gross negligence; inattentiveness does not fall into this category.

¶ 11 Negligent employees are simply one of the risks envisioned by this release, and Appellant was specifically informed of the risk of collision with another tube. It is a matter of common knowledge that people who are engaged in a routine and repetitive job for hours can become distracted. Such conduct is not reckless and was covered by this release.

¶ 12 I also strongly disagree with the majority's conclusion that Appellant can sue Mr. Monaghan because the release itself relates only to Camelback and not its employees. As noted by the majority, a corporation is a fictional entity created under the law that has no corporal existence; instead, it performs its activities only through its employees, agents, and officers. *Lokay v. Lehigh Valley Co-op Farmers, Inc.*, 342 Pa.Super. 89, 492 A.2d 405, 408 (1985) ("A corporation is a creature of legal fiction, and must 'act' through its officers, directors or other agents."). In finding that Appellant did not release the corporation's employees and released only the corporation, the majority negates the contract. Simply put, Camelback cannot act except through its employees. If its employees are not released from liability, neither is the corporation.

¶ 13 Clear and unambiguous contract language must be enforced by the courts. *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983); *De Lage Landen*

*Financial Services, Inc. v. M.B. Management*, 888 A.2d 895 (Pa.Super.2005). We ascertain the parties' intent from the language of the contract, and "intention is not to be determined merely by reference to a single word or phrase, but rather by giving every part of the document its fair and legitimate meaning." *Kelly v. Hannan*, 388 Pa.Super. 638, 566 A.2d 310, 312 (1989).

¶ 14 The majority's disposition ignores the clear and intended effect of this release. Appellant agreed to release Camelback from liability for negligent acts and thereby released Camelback's employees from liability because corporations act through their agents and employees. Mr. Monaghan was acting within the scope of his employment when Appellant was injured, and Appellant expressly agreed not to sue if she was injured as a result of a negligent act.

¶ 15 Hence, I would affirm the grant of summary judgment in favor of Camelback.

